## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| _____ | ) | |
| SAMANTHA WILLIAMS, | ) | |
|  | ) | |
| Plaintiff, | ) | Docket No. |
| v. | ) | |
|  | ) | |
| D'ARGENT FRANCHISING, LLC, | ) | |
| D'ARGENT CONSTRUCTION, LLC, | ) | |
| D'ARGENT COMPANIES, LLC, | ) | |
| JUSTIN GIALLONARDO, and | ) | |
| XYZ INSURANCE CO. | ) | |
|  | ) | |
| Defendants. | ) | |
| _____ | ) | |

## **COMPLAINT**

1.      Plaintiff Samantha Williams worked at a Huddle House restaurant owned by the D'Argent Companies. She worked as a server and was in training for a management position.

2.      Unfortunately for Ms. Williams, she became the object of attention one of the managers and owners of the D'Argent Companies, Justin Giallonardo,

3.      Justin Giallonardo engaged in a pattern of sexual harassment towards Ms. Williams. The harassment involved requests for dates, inappropriate nicknames and text messages, sexual overtures, and threats to keep the communications secret.

4.      The harassment culminated in Mr. Giallonardo tricking Ms. Williams into coming over to his house one night for a "barbeque" for prospective managers - that no one else was invited to.

5.      At the fake barbeque, Mr. Giallonardo tried to have sex with Ms.Williams.

6.      Ms. Williams declined to have sex with Mr. Giallonardo.

7.      Afterwards, Mr. Giallonardo told Ms. Williams' supervisor that:

**"If I can't fuck that girl, I'm going to fire her."**

8.      Ms. Williams' supervisor told her she was going to be fired.

9.      Ms. Williams quit to avoid a termination on her job record. Her resignation was recorded and submitted to the Louisiana Workforce Commission.

10.     But when Justin Giallonardo found out that Ms. Williams had quit before he could fire her, he was furious. In a final act of retaliation, he wrote up a new, fraudulent separation notice and back-dated it to a few days before she quit.

11.     Disturbingly, Mr. Giallonardo is D'Argent's <u>Head of Human Resources</u> – and so Ms. Williams had nowhere to seek help from.

12.     Ms. Williams' claims are highly credible. As detailed herein, they are corroborated by documentary evidence, audio recordings, social media evidence, and interviews with nearly a dozen former employees of the D'Argent Companies and other witnesses.

13.     Every single one of those witnesses corroborated the pattern of sexual harassment that Ms. Williams experienced.

14.     The witnesses described a consistent pattern – Justin Giallonardo repeatedly hired young women and then sexually harassed them until either (1) the women complained or rejected his sexual advances and were fired; or (2) the harassment reached a point where the female employees could take no more and quit.

15.     This is intolerable. It is legally forbidden and morally wrong.

16.     D'Argent's pattern of sexual harassment and retaliation ends here.

## I.      JURISDICTION AND VENUE

17.     Plaintiff brings this action pursuant to Title VII of the Civil Rights Act and other statutes. Jurisdiction is based on 28 U.S.C. § 1331 (federal question). Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear claims arising under state law.

18.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiffs' claims arose in the Western District of Louisiana, and because Defendants reside in the District.

## II. PARTIES

*Plaintiff*

19.     Plaintiff Samantha Williams is an adult citizen of the State of Louisiana and domiciled in the Western District of Louisiana. She worked at a Huddle House franchise owned by D'Argent Franchising, LLC, one segment of the integrated enterprise known as the "D'Argent Companies."

*Defendants*

20.     Defendant D'Argent Franchising, LLC is a Louisiana licensed Limited Liability Company, Charter No. 42412715K. Its principal place of business and headquarters are in Alexandria, LA. It is a part of the D'Argent Companies integrated enterprise.

21.     Defendant D'Argent Construction, LLC is a Louisiana licensed Limited Liability Company, Charter No. 35991917K. It was formerly known as Thomas Giallonardo, L.L.C. Its principal place of business and headquarters are in Alexandria, LA. It is a part of the D'Argent Companies integrated enterprise.

22.     Defendant D'Argent Companies, LLC is a Louisiana licensed Limited Liability Company, Charter No. 35787008K. Until February 2019, it was called D'Argent Development, LLC. Its principal place of business and headquarters are in Alexandria, LA. It is a part of the D'Argent Companies integrated enterprise.

23.     D'Argent Franchising, LLC, Defendant D'Argent Construction, LLC, and D'Argent Companies, LLC (together, the "LLC Defendants") are parts of an integrated enterprise known as the D'Argent Companies (or "D'Argent").

24.     At all relevant times D'Argent Franchising, LLC and the D'Argent Companies integrated enterprise continuously had at least 20 employees, and thus constituted "employers" in the meaning of Title VII and the LEDL. They are also employers engaged in an industry affecting commerce within the meaning of Title VII.

25.     Defendant Justin Giallonardo is a person of the full age of majority maintaining a residence in the Western District of Louisiana.  He is a manager, officer, director, and part owner of the LLC Defendants. Upon information and belief, he exercised operational control over significant aspects of the corporate Defendants' day-today functions.

26.     Defendants XYZ Insurance Companies 1-10 are not-yet-identified insurance companies that hold policies that cover any or all of the co-Defendants for their actions alleged herein.

27.     Except as otherwise indicated, each defendant is a joint tortfeasor with every other defendant under Louisiana Civil Code Art. 2324.

### III.     STATEMENT OF FACTS

**A. Justin Giallonardo repeatedly sexually harassed Ms. Williams, and tricked her into coming to his house in an effort to cause her to have sex with him.**

28.     Ms. Williams worked at a Huddle House restaurant franchise owned by D'Argent Companies from April 2019 to August 2020.

29.     She worked as a server and was in training for a management position.

30.     She reported to a head manager (known herein as "Manager # 1") who reported directly to Justin Giallonardo, the President of Business Development and Head of Human Resources for D'Argent Companies.

31.     While working for D'Argent's Huddle House franchise, Ms. Williams was subject to a pervasive pattern of unwelcome romantic and sexual advances and physical contact.

32.     This harassment came primarily from Justin Giallonardo.

33.     Prior to initiating sexual overtures with Ms. Williams, Justin Giallonardo asked # 1 if he could date her.

34.     Specifically, Giallonardo came into Manager # 1's office and said "I'm gonna try to fuck Sam."

35.     Manager # 1 responded "That's not cool, dude, that's my employee, I'm training her to be a manager." Giallonardo said "Naw, I'm going to try to take her out." Manager # 1 said "You're a boss, you can't do that."

36.     Giallonardo responded "I can do whatever I want to."

37.     Manager # 2, another manager of a D'Argent restaurant franchise, reports a similar event. On a particular day, Manager # 2 met with Justin at the Huddle House.  Justin asked, out of the blue "What do you think about Samantha?"

38.     Manager # 2 asked what he meant, and Justin indicated he was interested in employee Samantha Williams. Manager # 2 thought it was a joke, because it was so obviously wrong for a boss to date a subordinate.

39.     But it was not a joke. Mr. Giallonardo began dropping by the Huddle House franchise while Ms. Williams was working in an effort to strike up a relationship with her.

40.     During these visits he would engage in flirtatious conversation with Ms. Williams, ask her out on dates, and regularly try to hug her, despite her demonstrated discomfort with this contact.

41.     Manager # 1 describes Justin Giallonardo frequently dropping by the restaurant and saying "come here sweetie," "you're so pretty," "I'll buy you whatever you want, just be with me" to Ms. Williams.

42.     Manager # 2 witnessed Justin Giallonardo being inappropriate with Ms. Williams, describing the date he wanted to take her on – "I would take you out on the lake, buy you a steak dinner," *etc*.

43.     On one occasion, Justin Giallonardo said to Manager # 1 "I'm gonna get that ass one day," referring to Ms. Williams.

44.     Mr. Giallonardo also used flirtatious and unprofessional nicknames to refer to Ms. Williams.  At work and in text messages, he called her nicknames including "punkin," "doodle bug," "little lady," and "gal."  In a text message to Ms. Williams he specified that "punkin" was his way of referring to "Justin's Samantha."

45.     Mr. Giallonardo also engaged in unwanted sexual advances via phone calls and text messages outside of work.  In text messages, Mr. Giallonardo regularly asked Ms. Williams when she was free to go on a "dinner date" with him. *See, e.g.*:





46.     Ms. Williams repeatedly rebuffed these advances. Because Mr. Giallonardo was her boss's boss, she tried to do so gently, telling Mr. Giallonardo she had to work or didn't know her schedule.

47.     Nonetheless, Mr. Giallonardo persisted in asking her out.

48.     He also made repeated invitations to Ms. Williams to come to his home, which she initially declined via text message, insisting she had to work.

49.     Mr. Giallonardo indicated he knew his behavior towards Ms. Williams was improper through his insistence that she keep their communications secret.

50.     Shortly after they began communicating via text message, Mr. Giallonardo contacted Ms. Williams from a new phone number.  He informed her "This is my real #.  Use this one from now on.  Deal?"

51.     When she asked why he has two phones, he responded that he had a "public # and private."

52.     In another text message, Mr. Giallonardo told Ms. Williams, "We have a few things to chat about before things can proceed. . . I have an extremely private life and I'm sure you can respect that."

53.     He told her not to tell anyone about their interactions, and also instructed her to delete text messages he sent her.  He followed up on these demands via text message, asking "How you doing keeping this private?"

54.     These communications contributed to Ms. Willams's discomfort and were designed to discourage her from reporting the inappropriate behavior.

55.     Manager # 1 asked Giallonardo to stop harassing Ms. Williams. Giallonardo responded "She's my employee, I do what I want to."

56.     After Ms. Williams rejected his advances on multiple occasions via text message, Mr. Giallonardo said "I will just have to come to Huddle to see yah."

57.     Giallonardo told Manager # 1 **"If I can't fuck that girl, I'm going to fire her."**

58.     Manager # 1's testimony is recorded in a sworn statement, attached to this Complaint and incorporated herein by reference.

59.     He also expressed his frustration with her repeated rejections by texting Ms. Williams: "I give up."

60.     However, Mr. Giallonardo did not give up.

61.     In late November 2019, after Ms. Williams had rejected Mr. Giallonardo's requests for dates on multiple occasions, he invited Ms. Williams to his home under the guise of hosting a "barbeque" for her as a prospective manager.

62.     When Ms. Williams arrived, however, she was alone with Mr. Giallonardo.

63.     Mr. Giallonardo had not invited anyone else to the fake "barbeque."

64.     Ms. Williams sat on a table while Mr. Giallonardo sat on the couch watching television.  Mr. Giallonardo commented on the fact she was sitting so far from him and tried to convince her to sit closer to him.

65.     After she moved closer to him, Mr. Giallonardo pressured her to engage in physical contact by telling her to put her head on his chest and tried to grab her leg to pull her closer to him. Ms. Williams declined, and Mr. Giallonardo pressured her, saying "all the girls" like to "lay on him." She said no again, specifically pointing out that he was her "boss."

66.     Ms. Williams was uncomfortable and fearful during the interaction. She felt pressured due to Mr. Giallonardo's position of authority over her professionally. But Mr. Giallonardo made it intolerable and so she left.

67.     After Ms. Williams left the residence, she met with Manager # 1 about the incident and shared her distress about the situation.

68.     Manager # 1 reports that the day that Ms. Williams rejected Giallonardo's advances, she was extremely upset, shaking, and saying "I can't believe he did this."

69.     Manager # 1 said that "If you had seen her face when she got back [from being at Giallonardo's house], you'd think she'd been raped."

70.     On December 2, 2019, soon after the incident at Mr. Giallonardo's home, Ms. Williams reiterated via text message to Mr. Giallonardo that she was not open to a relationship.

**C.     After Ms. Williams rejected Justin Giallonardo's advances, he said he was going to fire her. When she quit to avoid termination, he falsified paperwork to make it look like she had been fired for cause.**

71.     Prior to December 2, 2019, Ms. Williams received only positive feedback on her job performance.  Mr. Giallonardo would regularly tell Ms. Williams she was doing an excellent job, even sending her a text message stating: "Good job.  You are doing great with that."

72.     On December 2, 2019, Ms. Williams sent Mr. Giallonardo the text message clearly indicating that she was not open to a relationship.

73.     After that, Justin Giallonardo dramatically changed his treatment of Ms. Williams.

74.     He claimed that Ms. Williams was conducting the count of cash incorrectly and made other complaints about her job performance to the head manager at Huddle House.

75.      Mr. Giallonardo was looking for an excuse to fire Ms. Williams in retaliation for her rejection of his advances.

76.     This is corroborated by Manager # 1, who reports that "ever since that day" that Ms. Williams rejected Giallonardo's advances, Giallonardo would make repeated complaints about her.

77.     Manager # 1 asked Giallonardo, "Is Samantha not doing things right because she isn't doing things right, or because she wouldn't have sex with you?"

78.     Giallonardo did not answer.

79.     For months after December 2, 2019, Justin Giallonardo suggested to Manager # 1 that he fire Ms. Williams. Manager # 1 declined.

80.     Finally, on Friday, August 14, 2020, Giallonardo made it an order – he directed Manager # 1 to fire Ms. Williams.

81.     Manger # 1 told Justin that he needed Ms. Williams for the weekend, and if Justin wanted to fire her, he'd have to do it himself on Monday.

82.     Manager # 1 then told Ms. Williams that she was going to be fired the next week.

83.     Ms. Williams then resigned to avoid having a termination on her job record.

84.     She resigned on Sunday, August 16, 2020, as shown on her separation notice as written up by Manager # 2. That notice is shown below as Fig. 1.

**Separation Notice**

LOUISIANA
**WORKFORCE**
COMMISSION

**Employer Information**

D'Argent Franchising, LLC
1460 Centre Court

Company:
Company Street Address 1:
Address 2:                                    Alexandria
City:                                         LA
State:                                        71301
Zip:                                          Richard Molina
Name:                                         Manager
Title:                                        318-787-6049
Phone Number:                                 RichardM@dargentcompanies.com
Email Address:

**Employee Information**

Samantha
Employee First Name:                          Williams
Employee Last Name:                           xxx-xx-4440
Employee SSN:                                 08/16/2020
Employee Date of Separation:                  04/26/2019
Employee Date Hired:                          08/15/2020
Employee Date Last Worked:

**Separation Reason**

Resigned / Quit
Employee Quit

Reason For Separation:
Explain Reason for Separation:

**Benefit Payments**

Hours Worked Per Week: 40

Hourly Rate of Pay: $9.00              Total Amount:          Number of Hours: 0
Vacation/Accrued Leave - Not PTO : No  Total Amount:          Number of Hours: 0
Severance/Dismissal: No                Total Amount:          Number of Hours: 0
Bonus:  No                             Total Amount:          Number of Hours: 0
Holiday Pay: No                        Total Amount:          Number of Hours: 0
Wage in lieu of Notice: No
Pension: No
        If lump sum, what would the monthy amount
        be if that option had been choosen?

I certify that the worker whose name and Social Security Number appear above has been separated from work
and that the above information is true and correct. I further certify that the individual has been handed or
mailed a copy of this notice.

This form has been submitted electronically. There is no need to mail a copy to Louisiana Workforce
Commission.

IMPORTANT: Give a copy of this form to the separating worker and retain a copy for your files.

_Richard Molina_                        8/18/20
        Signature                               Date

Separation Notice (Form 77)   Submitted to HiRE: 8/18/2020 1:40:03 PM

**Fig. 1:** Ms. Williams separation notice showing that she quit.

85.     The separation notice was submitted to the Louisiana Workforce Commission on August 18, 2020 at 1:40:03 p.m.

86.     When Justin Giallonardo found out that Ms. Williams had quit before he could fire her, he was furious.

87.     So he engaged in one last act of retaliation towards Ms. Williams.

88.     He wrote up a *new* separation notice in which Ms. Williams was fired, and directed Manager # 2 to sign it.

89.     He then back-dated the new, fraudulent separation notice to August 15, 2020.

## D'Argent Franchising, LLC

1460 Centre Court

Alexandria, LA 71301

(318) 787-6049 (Voice)
(318) 787-6726 (Fax)
(email)

### Separation Report

Employee ID or SSN: ████████

Employee Name: (First) Samantha (Middle) Nicole (Last) Williams (Suffix)   Date: 8-15-20

Street Address: ████████   Telephone No. ████████

City, State, Zip Code: LeBlanc, La 70651   Mobile Phone No. _____

**Reason for Separation:**

- [ ] Layoff, Lack of Work
- [x] Discharge, Poor Performance
- [ ] Retirement
- [ ] Voluntary Termination
- [ ] Resignation
- [ ] Other

Dates of Employment: From 4-24-19 To 8-15-20

Rate of Pay: 2.13/hour

Compensation paid after separation:

Vacation Pay _____   Severance Pay ⊘   Other ⊘

Eligible for Unemployment Compensation?  [ ] Yes [x] No
Eligible for Continued Benefits?  [ ] Yes [x] No
Eligible for Rehire?  [ ] Yes [x] No

Reason for Separation:

Threatening, Abusive, or Vulgar language
Insubordination                                per handbook

Employee's Comments:

Supervisor's Comments:

None

Employee Signature: _____   Date: _____

Supervisor Signature: Richard Meli   Date: 8-15-20

**Fig. 2:** The fraudulent, back-dated separation notice in which Justin "fired" Ms. Williams.

A.      **D'Argent's managers repeatedly engage in sexual harassment of female employees.**

90.     D'Argent has a pattern of repeatedly sexually harassing its female employees.

91.     Specifically, D'Argent's human resources manager Justin Giallonardo has repeatedly hired young women and then sexually harassed them until either (1) the women complained or rejected his sexual advances and were fired; or (2) the harassment reached a point where the female employees could take no more and quit.

92.     Ms. Williams was one of the young women subject to this pattern of harassment.

93.     The pattern of harassment described below corroborates Ms. Williams' allegations and makes them more plausible.

94.     That pattern is described by former D'Argent employees as follows:

95.     **H.R. Assistant # 1**, a former D'Argent employee, reports that Justin Giallonardo would make comments about her relationship and sexual activity. For example, at one point in December 2019, she described what she bought her husband for Christmas. Mr. Giallonardo responded that a gift was unnecessary, and instead she should "get a nice outfit and be available whenever [her husband] wants, to suck his dick on the couch."

96.     Mr. Giallonardo suggested that he thought H.R. Assistant # 1 would be good at oral sex.

97.     Justin Giallonardo would talk to H.R. Assistant # 1 about his sexual encounters. He told her that he had had sex with one of the company's vendors, but he wouldn't do it again because she had a "hairy pussy."

98.     He would describe sex with his ex-wife, and said that "she was like a bunny, she'd always hop on me."

99.     He would describe to H.R. Assistant # 1 how he "fucked these whores," by which he meant the women he had sex with in general.

100.    Justin Giallonardo would make comments and hand gestures about H.R. Assistant # 1's body.

101.    For example, he asked her if she had ever had a "stalker." After she described an example of unwelcome attention, he asked "did you have the figure you have now back then" and then motioned to his chest, waist, and buttocks to describe those parts of her body.

102.    Giallonardo told H.R. Assistant # 1 that he was disgusted by her tattoos, that "women down here [in the South] don't do that."

103.    He also asked H.R. Assistant # 1 to comment about *his* body. He asked what H.R. Assistant # 1 thought of his feet, and asked if she had a "foot fetish."

104.    He would wear loose basketball shorts, and tell her that he was "freeballing," and asked her and another female employee if they thought "the hoes would like it."

105.    He would say his penis "has a mind of its own."

106.    Justin Giallonardo would direct sexually suggestive and romantic comments specifically at H.R. Assistant # 1. For example, he said that if the world was ending, he would choose H.R. Assistant # 1 to procreate with.

107.    On at least one occasion, Justin Giallonardo touched H.R. Assistant # 1's buttocks with his hand, but tried to disguise it as an accident.

108.    On a near-daily basis he would ask about H.R. Assistant # 1's female friends to determine whether they might fit his "requirements" for a sexual or romantic partner.

109.    He particularly asked about one of H.R. Assistant # 1's friends, who is a gay woman. He would ask if she was "still a lesbian" and ask questions about how she "scissored."

110.    He asked if H.R. Assistant # 1 had ever had sex with a woman, because she seemed like the kind of woman "who would do stuff like that."

111.    At one point, Mr. Giallonardo told H.R. Assistant # 1that he had watched "lesbian porn" over the weekend expressed his opinion that H.R. Assistant # 1's friend "hasn't had the right dick yet." He also asked what kind of pornography H.R. Assistant # 1 enjoyed.

112.    He would also talk to H.R. Assistant # 1 about his assessment of the other female employees in the office, and how they did or did not meet his "requirements." One employee he said fit his "southern woman" criteria because she looks to cook and clean, but would not fit his requirements because she was overweight.

113.    Mr. Giallonardo also critiqued H.R. Assistant # 1 for her compliance with his "requirements." He told her that "figure wise, you meet the criteria," but told her that she didn't meet other criteria because she was "not the type of woman to be submissive," and because she didn't want to be a stay-at-home mother.

114.    Justin Giallonardo engaged H.R. Assistant # 1 in a conversation about how "racism and sexism aren't a thing anymore." He said "so you think you should get a promotion after taking maternity leave, while Sarah or Kyle have been here working their asses off. It was your choice to have the baby." H.R. Assistant # 1 pointed out that in some cases, a doctor orders bedrest and leave. Mr. Giallonardo responded: the "doctor doesn't sign your paychecks – I do." She said that he'd have to follow the federal law. He said "federal doesn't sign your paychecks."

115.    Mr. Giallonardo also expressed his opinion that if a woman got pregnant, she shouldn't "take maternity leave" – instead, she should "stay home, and take care of her husband."

116.    When H.R. Assistant # 1 complained about Mr. Giallonardo's inappropriate behavior, he would get angry and punish her by chastising her work, and making her do punitive repetitive tasks – like forwarding her emails and telling her to unsubscribe from them. He also retaliated against her by talking negatively about her to other leadership.

117.     The sexual harassment against H.R. Assistant # 1 was often intertwined with racial slurs and unwelcome comments about H.R. Assistant # 1's race.

118.     H.R. Assistant # 1 is Hispanic. Mr. Giallonardo would often refer to H.R. Assistant # 1 as a "wetback," and suggested that H.R. Assistant # 1's secondary sexual characteristics (such as her breasts and buttocks) were the result of her racial background.

119.      For example, Mr. Giallonardo pointed to a picture of white women in Hooters photo, and told H.R. Assistant # 1 "Don't be racist and make these girls feel bad because they're not as privileged as you; you'd have no problem working at Hooters whatsoever."

120.     H.R. Assistant # 1 also observed sexism was also reflected in the other leadership of the company.

121.     For example, Thomas Giallonardo III, the owner and CEO of D'Argent Company, asked H.R. Assistant # 1 to find an accounting intern. He told her to look for either a person with business finance experience or an accountant. He said, "I'd prefer a man, because they are better at numbers. But if it's an accountant, I'd prefer a woman because they are better at organizing." H.R. Assistant # 1 found a Black woman with a Masters Degree in business finance, who was a Ph.D. doctoral candidate, and brought her in for an interview. Thomas Giallonardo told H.R. Assistant # 1 that he wouldn't hire the woman because "this girl just has a degree in business."

122.     **Receptionist # 1**, a former D'Argent employee, also describes a pattern of sexual harassment by Justin Giallonardo and CEO Thomas Giallonardo.

123.     Justin Giallonardo questioned Receptionist # 1 about her sexual habits and preferences, and speculated about her sexual history.

124.     In particular, Mr. Giallonardo commented several times that "he could tell" Receptionist # 1 "had been abused sexually as a child," that she probably "liked certain sexual kinks," and "was probably into older men, and probably liked to be choked or slapped in bed."  In

response Receptionist # 1 tried to change the subject, and told him that is "not something people want to talk about."

125.   Justin Giallonardo made inappropriate comments about Receptionist # 1's physical appearance.   On at least one occasion he said: "Completely off record, that shirt looks good on your chest."

126.   Justin Giallonardo would also commonly talk about his own sex life to Receptionist # 1.  He would share unsolicited details of when he had sex and specific sex acts he engaged in. He would also tell Receptionist # 1 and other female employees about occasions when he cheated on a girlfriend.

127.   Justin Giallonardo also engaged in physical activity that made Receptionist # 1 feel uncomfortable.  Specifically, Mr. Giallonardo would regularly urinate in an open courtyard located within view of office windows during business hours.  This conduct was visible to individuals inside the office.  Mr. Giallonardo said he knew people could see him urinating but he didn't care.

128.   CEO Thomas Giallonardo, III used the office for inappropriate personal purposes.

129.   He routinely slept at the office and allowed his girlfriend to sleep there with him.

130.   Both he and his girlfriend would be around Receptionist # 1 and other employees while partially dressed or wearing only underwear.

131.   On occasion, Thomas Giallonardo required Receptionist # 1 to wash bedsheets stained with sexual fluids after he had slept in them at the office.

132.   Receptionist # 1 heard the Giallonardos repeatedly joke about Thomas Giallonardo's girlfriend "Sherl" as "the handbag" because she had been "passed around" between the Giallonardos.

133.     Several times, Justin Giallonardo asked Receptionist # 1 when she was going to "fuck" his cousin Joey (a former D'Argent employee). He would do a hand motion to simulate sex when he said this.

134.     Justin Giallonardo told other employees, falsely, that Receptionist # 1and Joey had had sex.

135.     Justin Giallonardo on approximately a weekly basis would ask Receptionist # 1 to go work as a stripper for D'Argent's former employee Gary Archer.

136.     Justin proposed that he would keep a "cut" of any money Receptionist # 1 earned in that manner. Justin would suggest that because Receptionist # 1 was "plus sized" and a "southern belle" would be a "fetish" and get more money.

137.     Receptionist # 1 would repeatedly say she was "not going to do that" because she was a mother and a Pentecostal – but Justin would still push her.

138.     On other occasions, Roland Giallonardo, a former employee of D'Argent Companies, engaged in inappropriate sexual behavior with female employees including Receptionist # 1.  Roland Giallonardo, an uncle of Justin Giallonardo, would frequently come to the office and unsolicitedly rub the backs, shoulders, and necks of female employees.  Roland Giallonardo engaged in this behavior with Receptionist # 1. D'Argent's management allowed this to occur.

139.     The impact of all this behavior was exacerbated by the fact that Justin Giallonardo was the head of Human Resources – and so the women at D'Argent had nowhere to turn for help.

140.     Receptionist # 1 took an HR class with Mr. Giallonardo, and after the class reminded she him that using profane language can be a form of sexual harassment.

141.    Mr. Giallonardo dismissed her concerns, stating "it doesn't matter because we are a small company," suggesting that he understood the requirements of anti-discrimination law but believed the law did not apply to D'Argent.

142.    Justin Giallonardo was aware that this conduct was in direct conflict with his role as Head of Human Resources.

143.    He would frequently say "this isn't HR but…"

144.    By saying "this isn't HR but," Mr. Giallonardo meant that he was aware that what he was saying was not appropriate.

145.    Justin Giallonardo also mandated that both H.R. Assistant # 1 and Receptionist # 1, along with the other women in the office (and only the women in the office), participate in the process of finding him sexual partners.

146.    On one of her first days on the job, Mr. Giallonardo handed H.R. Assistant # 1 a document entitled "Requirements for Wife." (A copy is attached here as Figure 3.)

147.    He explained that "now that you're working here, these are my requirements for a wife. I want you to help me find her.  . . . She has to fit a majority of these requirements. I don't care if she is a military spouse with kids, so long as her spouse has to be out of the picture." He told her that "whenever an opportunity crosses your mind, tell me immediately."

**Figure 3:** Justin Giallonardo's "Requirements for Wife"

## Requirements for Wife (Revised '19)

**Looks**
- 5'2" to 5'6"
- 28-35 years' old
- 115-150 pounds
- C + boobs - Can always buy more if requirement not met
- Big eyes, pronounced jaw structure and thick hair

**Family**
- Parents still married – one grandparent still alive
- Must have brothers and/or sisters – not an only child
- Knows how to handle money; family is well to do
- Fit family – outgoing and active family members
- Must want 2-4 children, want to be a stay at home mom, if opportunity arises.
- Family pet or a history of pets in the household

**Traits**
- Enjoys all music genres, tolerates NFL football and loves to travel
- Adventurous eater with advanced palate.
- Likes to tend a garden and knows her way around a flower bed
- Will go fishing but not take fish off the line
- Meticulously clean, SUPER clean. CLEAN! AGH CRAZY CLEAN!!
- Early to bed, early to rise – no night owls
- Decorator and fashion savvy traits are a must. Enjoys dressing her man
- Can go Cajun dancing in a honky-tonk one night and the next a black tie ballroom social
- Must be ready to leave within 30 minutes for any type of occasion

**Business**
- Attorney, nurse, teacher, doctor, CPA, successful entrepreneur of a normal business (not art) or a professional southern belle.
- Driven and goal oriented – No couch potatoes
- Owns vehicle (paid for preferred)
- Own a home (rent to own is acceptable)
- Limited student debt – Under $10k.

148.    **Administrative Assistant # 1** was a female D'Argent employee who worked as Thomas Giallonardo's personal assistant for six months.

149.    She heard Thomas Giallonardo bragging about sexual conduct with an underage girl, was exposed to Justin Giallonardo's written sexual fantasies about co-workers, was asked to find paid sexual partners for Thomas Giallonardo.

150.    In one meeting with a potential client, Administrative Assistant # 1 had to listen to Thomas Giallonardo tell the potential client how he had "got a 15-year-old girl to suck his ass when he was in the Dominican [Republic]."

151.    On one business trip, Thomas Giallonardo asked Administrative Assistant # 1 to procure "sugar babies" – *i.e.*, women who would have sex for compensation – on the website Seeking.com, which describes itself as "The Official Sugar Daddy Site."

152.    Administrative Assistant # 1 described a document in which Justin Giallonardo recorded "the sexual fantasies about the people who work" for D'Argent.

153.    The document was stored on a D'Argent company server.

154.    This document, for example, recorded that Justin Giallonardo thought H.R. Assistant # 1's "tits look great" and gave him an erection.

155.    Justin Giallonardo once told Administrative Assistant # 1 that a "true man" would want a woman he could "control," and indicated that the best person to control is a woman who is like a "child."

156.    **Accountant # 1** was a female employee who worked at D'Argent for a year and a half.

157.    On her first day, Tom Giallonardo told her to "move her bony ass." When Accountant # 1 expressed that it was inappropriate, Tom just laughed.

158.   She also says that Tom frequently says "kiss my pussy" instead of the phrase "my mistake."

159.   She was also given the "Requirements for a Wife" list by Justin Giallonardo. He walked into her office and said "since I'm single here is a list of what I'm looking for."

160.   Her boyfriend came to the office and Justin took him in another room and showed him pornography of a woman using strap-on dildo on a man, asked if he thought it was "gay."

161.   She corroborates that she would see Justin peeing outside "daily."

162.   Accountant # 1 told Justin multiple times he was inappropriate but he would not change his behavior.

163.   **Admin Assistant # 2** was a female employee who worked at D'Argent for six months.

164.   On her first day, she was asked to wash Tom Giallonardo's underwear and dirty sheets.

165.   She recalls that Justin Giallonardo would say terrible things about his girlfriend, how he "just had her for the sex." One time, when Justin's girlfriend was on the news, he told Admin Assistant # 2 "I'm hitting that."

166.   Justin Giallonardo would describe to her the "bitches" he had lined up to date.

167.   She corroborates seeing Justin go outside to urinate, and also other executives do the same on a particular plant. Then they brought the plant inside. It was leaking with urine, and Admin Assistant # 1 was told to clean it up.

168.   Thomas had Admin Assistant # 2 pick out gifts for his girlfriend and mistress.

169.   Thomas had her book him a vacation, and had her asked about the nudity policy.

170.   She frequently heard Tom Giallonardo say "kiss my pussy."

171.    On several occasions Admin Assistant # 2 saw pornography on Tom Giallonardo's phone and office computer. She reported the incident to a human resources liason (Marketing Employee # 1). Shortly thereafter, she was fired.

172.    **Marketing Employee # 1** was a female employee who worked directly under Justin Giallonardo in human resources. She worked with him for approximately two years.

173.    Marketing Employee # 1 also worked as a human resources liaison. In that capacity, two female employees came to her with complaints, one regarding a franchisee outside the office, the other who said Thomas Giallonardo showed her pornography on his computer.

174.    The employee who was shown pornography was fired a week later after she complained about the conduct to Marketing Employee # 1.

175.    Marketing Employee # 1 recalls Justin talking about his sex life with his girlfriend Jana.

176.    Marketing Employee # 1 recalls Justin printing the "list of qualities" and giving it to her sometime in 2017 or 2018, and asking her to keep an eye out for women meeting the criteria. She told him it was inappropriate.

177.    She recalls going to a conference with Justin and Tom. Justin brought his girlfriend and would describe to Marketing Employee # 1 the specific sexual acts he were doing in his hotel room (throwing his girlfriend up against wall, floor, pulling her hair, *etc*.) and asked Marketing Employee # 1 if she could hear them.

178.    Marketing Employee # 1 witnessed and experienced Roland Giallonardo coming to the office and rubbing the shoulders of female employees. She confirms it was unwanted.

179.    She would frequently tell Justin he was going to get sued, he would laugh or tell her "what happened at D'Argent stays at D'Argent." Another time she told him "y'all are gonna get your ass sued." Justin Giallonardo responded **"**I wish people would stop saying that."

180.    **Manager # 1** is a former male employee who was a manager of one of the D'Argent restaurants for approximately two years.

181.    He witnessed Justin Giallonardo point to a female blonde employee and say "I'm going to fuck that bitch" within earshot of the female employee. She turned around in shock.

182.    He witnessed Justin and Thomas Giallonardo walk around the office in boxer shorts, more than once.

183.    He witnessed Justin Giallonardo say about a female employee "somebody better help her fat ass lose weight."

184.    He witnessed Justin Giallonardo rubbing his genitals while looking at Receptionist # 1.

185.    <u>**Manager # 2**</u> is a former male employee who was a manager of the D'Argent restaurants.

186.    He said Justin would watch the female employees on their security camera system, and make "lewd comments." Justin described one employee as a "worthless fat bitch," described another as "that's a nice ass." Justin would ask Manager # 2 if female employees were single.

187.    He described Justin as going into "very explicit detail" about his sexual activities with his girlfriend, who he called the "frog."

188.    He heard Justin call a female D'Argent employee a "cunt."

189.    He witnessed Justin talk to Receptionist # 1 inappropriately, describing a hypothetical relationship between them "if it was me, I would take you out, I would buy you the best things," *etc.*

190.    Manager # 2 would witness Thomas and Justin Giallonardo walk around in their boxers at the office, during office hours, while female subordinates were present.

191.    Manager # 2 witnessed Justin Giallonardo peeing outside on the patio behind the office, with his penis out and visible.

192.    Justin Giallonardo gave a print-out of the "Requirements for a Wife" to Manager # 2's fiancée, who was a female employee at another D'Argent franchise. He did not, however, give a copy to Manager # 2.

193.    **Coordinator # 1** is a female employee who worked at D'Argent for several years. She describes:

194.    Her supervisor, Tommy Giallonardo (the son of Thomas Giallonardo) would frequently make comments about her appearance. One time she apologized while wearing yoga pants, and Tommy said "looking like that, you don't need to apologize."

195.    Justin Giallonardo was always talking about "boobs and butts," and would say things to Coordinator # 1 like "you look so hot in that dress, could I pull it off?"

196.    She heard Justin talk about tasting a female coworker's breastmilk. He asked that coworker "if it would be too much" if he asked to taste it.

197.    Coordinator # 1 would tell him "Justin, we're not talking about that, that's not a work conversation." He would say "I'm HR and it's okay."

198.    Coordinator # 1 reports that female employees were treated very differently than male employees. The executives would ask the female employees to shop for clothes, or for shoes, or birthday gifts, or wrap presents, or go grocery shopping. They would ask female employees to use their personal lunch break to get food for the executives. When asked if male employees were asked to perform similar tasks, Coordinator # 1 laughed and said "no, no."

199.    She had a female coworker come to her and describe how she had been called to Tom Giallonardo's office, and had seen pornography playing on his computer.

## IV.     Causes of Action

### Count One – Violation of Title VII of the Civil Rights Act
### (LLC Defendants)

200.     Plaintiff realleges and incorporates each and every foregoing paragraph.

201.     Title VII of the Civil Rights Act bars gender discrimination in the form of workplace sexual harassment. Civil Rights Act of 1964, § 701 *et seq*., as amended, 42 U.S.C. § 2000e *et seq*.

202.     A hostile work environment resulting from sexual harassment is a kind of gender discrimination that violates Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

203.     A prima facie case of hostile work environment requires: (a) the employee belongs to a protected group, (b) the employee was subject to unwelcome sexual harassment, (c) the harassment was based on sex, (d) the harassment affected a "term, condition, or privilege of employment," and (e) *respondeat superior* (*i.e.*, the employer knew or should have known of the harassment and failed to take remedial action). *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir. 1986). Where the harasser is a supervisor, this last element can be eliminated. *Watts v. Kroger Co.,* 170 F.3d 505, 509 (5th Cir. 1999).

204.     For behavior to be harassment, the conduct must be unwelcome "in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." EEOC Compl. Man. (CCH) P3114 (Mar. 19, 1990) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982). Sometimes behavior from the plaintiff appears to welcome or encourage the harassment, when in fact that reciprocation of sexual behavior was coerced. *See Phillips v Smaelly Maintenance Serv., Inc.* 711 F.2d 1524 (11th Cir. 1983) (holding lower court correct to consider that the alleged harasser knew plaintiff

needed job to make house payments and exploited her financial need to solicit sexual relations).

205.    Harassment affects a "term, condition, or privilege of employment" when it is "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 401 (5th Cir. 2013), quoting *Harvill v. Westward Commc'ns, L.L.C.,* 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L.Ed. 2d 49 (1986)). In *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.*, the employee had a viable hostile work environment due to the "frequency of unwanted attention," where her harasser repeatedly called her, asked to "snuggle," and repeatedly asked to get coffee after work. *Lauderdale v. Texas Dep't of Criminal Justice, Institutional Div.,* 512 F.3d 157, 164 (5th Cir. 2007). The Fifth Circuit found that "[g]iven this pervasiveness, the level of severity necessary to establish an altered work environment is diminished." *Id.*

206.    An employer make take advantage of an affirmative defense against sexual harassment if it can show: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293, 141 L. Ed. 2d 662 (1998).

207.    No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.* at 2279. This is *quid pro quo* harassment, and results in strict liability for the employer. *See* EEOC Enforcement Guidance, "Vicarious Employer Responsibility for Unlawful Harassment by Supervisors" (June 18, 1999).

208.    Title VII, specifically 42 U.S.C. § 2000e-3 makes it unlawful for an employer to

retaliate against an employee who has opposed an unlawful employment practice, or a practice they reasonably believed to be unlawful.

209.    Here, Ms. Williams was in a protected class, as a woman.

210.    Her harasser, Justin Giallonardo, was a supervisor. Specifically, he was Ms. Williams' supervisor's supervisor, and also a part owner of the business.

211.    Ms. Williams did not welcome the Justin Giallonardo's behavior. She did her best to deflect or ignore his behavior, often changing the topic.

212.    Justin Giallonardo's behavior went beyond merely "distasteful," and included explicit invitations to conduct sexual acts. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). His behavior was offensive, severe, unwelcome, and pervasive.

213.    The pervasiveness of the conduct created a hostile work environment that was severe enough to affect the terms, conditions, and privileges of employment.

214.    Defendants, through pervasive sexual harassment, created a hostile work environment for Ms. Williams.

215.    When they fired Ms. Williams for refusing to acquiesce to sexual conduct, Defendants committed *quid pro quo* sexual harassment and retaliation.

216.    Defendants' conduct was intentional and done with malice or with reckless indifference to the federally-protected rights of Ms. Williams.

217.    As D'Argent's Human Resources officer, Justin Giallonardo was aware of the requirements of federal law. He explicitly rejected those requirements as not applying to D'Argent.

218.    Defendants' actions have caused Ms. Williams to suffer mental, emotional and psychological harm.

219.    Ms. Williams suffered a loss of present and future wages, employment benefits, and future career opportunities as a result of Defendants' unlawful conduct.

220.    On September 17, 2020, Ms. Williams filed Charge of Discrimination No. 461-2021-00031 with the Equal Employment Opportunity Commission.

221.    On December 18, 2020, Ms. Williams was issued a Right to Sue Letter.

### Count 2 - Louisiana Employment Discrimination Law
### (LLC Defendants)

222.    Plaintiff realleges and incorporate each and every foregoing paragraph.

223.    La. R.S. 23:332(A)(1) makes it unlawful to discriminate against any individual in employment based on their sex.

224.    By the conduct alleged herein, Defendants subjected Ms. Williams to gender discrimination in the form of hostile workplace sexual harassment, *quid pro quo* sexual harassment, and retaliation in violation of the Louisiana Employment Discrimination Law.

### Count Two – Intentional Infliction of Emotional Distress
### (All Defendants)

225.    Plaintiff realleges and incorporate each and every foregoing paragraph.

226.    Intentional infliction of emotional distress is (a) intentional or reckless conduct (b) which was extreme and outrageous; and (c) caused severe emotional distress to the plaintiff. Mississippi recognizes such a cause of action even in the absence of physical injury. See *Jones v. Fluor Daniel Services Corp.*, 959 So. 2d 1044 (Miss. 2007); *First Nat. Bank v. Langley*, 314 So. 2d 324, 77 A.L.R.3d 570 (Miss. 1975).

227.    Here, Defendants intentionally and recklessly sexually harassed Ms. Williams and retaliated against her when she refused to have sex with Justin Giallonardo.

228.    Their pervasive lewd comments, requests, gifts, and solicitations were extreme and outrageous.

229.    The final act of retaliation – fraudulently creating and backdating a termination notice – served no purpose other than to cause distress to Ms. Williams.

230.    Ms. Williams suffered severe emotional distress as a result of Defendants' behavior.

## Count 3 – Intentional Spoliation and Witness Intimidation
### (All Defendants)

231.    A "state law tort claim for spoliation of evidence" exists when a "defendant intentionally destroyed evidence." *Longwell v. Jefferson Par. Hosp. Ser. Dist*., 970 So.2d 1100, 1104 (La. App. 2007).

232.    Here, Defendants learned in 2020 that they were being investigated by counsel for their employees.

233.    Once they learned they were being investigated, Defendants engaged in a campaign of spoliation of evidence and witness intimidation. Plaintiff has learned of three elements of this campaign:

234.    **First**, when Defendants found out an EEOC claim had been filed against them, they began to change documents, memberships, and other items in an effort to make the various parts of their integrated enterprise appear "separate" when they were not.

235.    This is because Defendants have a rudimentary understanding that Title VII and other federal statutes only apply to companies with more than fifteen employees.

236.    So Justin Giallonardo called Manager # 1 and Manager # 2 into his office and said "[Receptionist # 1] is suing us. . . What I need y'all to do is go to your computers and go into Heartland [payroll system] and make everyone part time. The only full-time employees we need to have is the managers. We have to make everything separate."

237.    Manager # 1 described Justin as treating this "like a 911 deal" – *i.e*., an emergency.

Justin explained that it was because Receptionist # 1 was "coming after" him.

238.   Manager # 1 reports that after that point Justin was "making everything separate." For example, Justin previously had "D'Argent Companies" Sam's Club cards for the restaurant, and after the EEOC charge, he changed it to "D'Argent Franchising."

239.   **Second**, Defendants engaged in deliberate witness tampering and spoliation of evidence when they filed a police report and urged prosecution of witness Ricky Molina shortly after finding out he was a witness against Defendants.

240.   Specifically, on August 11, 2020, Justin Giallonardo and Manager # 2 had a disagreement over money.

241.   The disagreement was resolved, and on September 8, 2020, Manager # 2 was promoted to general manager of the Huddle House franchise.

242.   On September 23, 2020, Manager # 2 was fired.

243.   On October 15, 2020, Manager # 2 was identified for the first time as a witness in the potential legal proceedings against D'Argent, in a letter from Plaintiff's counsel to D'Argent's counsel Jones Walker.

244.   On information and belief, Jones Walker forwarded the letter to D'Argent sometime in the next few days.

245.   On October 22, 2020, having learned that Manager # 2 would be a witness against them, D'Argent reported Manager # 2 to the police for felony theft.

246.   D'Argent reported Manager # 2 to the police in an effort to intimidate him and chill his testimony against D'Argent.

247.   **Third**, Defendants destroyed evidence when they deleted the @LeroyGuillot Twitter account after they received a preservation request that specifically requested preservation of that Twitter account.

248.    The @LeroyGuillot Twitter account was used by CEO Thomas Giallonardo III to complain about women, "blacks," transgender persons (who he describes as men who have "cut [their] goober off"), Dr. Martin Luther King, Jr., and other people and groups.

249.    The @LeroyGuillot Twitter account was evidence relevant to this case because it showed the attitude of D'Argent's leadership towards women and gender, and because it reflects D'Argent's leadership's understanding of "discrimination" and "bigotry."

250.    A few examples are as follows:





251.     Once a third party connected Mr. Giallonardo to the "Leroy Guillot" account, Mr. Giallonardo made the Twitter account private, took his photo off of it, and changed his description from "Just a Cajun boy from south Louisiana" to "Just a cowboy from Montana."

252.     After Thomas Giallonardo made the account private, Plaintiff's counsel learned about the account.

253.     Because the account was private, Plaintiff's counsel could not read any of the account's tweets on Twitter.

254.     Plaintiff's counsel could, however, see a small subset of the account's tweets using an internet archive service.

255.     The small subset (including the images above) was enough to indicate that the account was relevant evidence.

256.     So on June 30, 2020, Plaintiff's counsel sent a preservation letter to D'Argent Via U.S. Mail, fax to 318.787.6726, and email to info@dargentcompanies.com and tomg@dargentcompanies.com.

257.     The preservation letter specifically identified "All social media of all executives, including but not limited to twitter.com/LeroyGuillot" as among the evidence that should be preserved.

258.     Despite having received the preservation notice, Defendants deleted the @LeroyGuillot account.

259.     This was done in an effort to spoliate evidence.

260.     Spoliation and alteration of documents was a common business tactic by D'Argent.

For example, Administrative Assistant # 1 reported that Thomas Giallonardo would brag that after a commercial rental agreement was signed, he would go in and alter the rental price if he thought the tenant hadn't read it carefully enough to catch the alteration.

**Count 4 – State Law Direct Action Claim**
*Against XYZ Insurance Companies*

261.    Plaintiffs incorporates and reasserts the allegations in each preceding and following paragraphs of this Complaint.

262.    Defendant ABC Insurance Companies, upon information and belief, have issued and/or currently have in effect one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

263.    By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries they have suffered as a result. Upon information and belief, Defendant Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

264.    Upon information and belief, Defendant Insurance Companies are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

265.    Under Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendant Insurance Companies to recover any and all sums they are obligated to pay

Plaintiffs on behalf of their insureds or to indemnify their insureds.

## I.   RELIEF REQUESTED

266.   Wherefore Plaintiff prays for judgment against Defendants as follows:

(a)  For a judgment against Defendants for all asserted causes of action;

(b)  For a judgment awarding compensatory damages;

(c)  For a judgment awarding special damages;

(d)  For a judgment awarding Plaintiff her costs and attorney's fees;

(e)  For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law; and

(f)  For all other and further relief as may be necessary and appropriate.

267.   Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this Court may seem equitable.

268.   Plaintiff reserves the right to notice of defect to this pleading and reserve the right to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

## <u>JURY DEMAND</u>

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully Submitted:

**LAW OFFICE OF WILLIAM MOST**

*/s/ William Most*
**WILLIAM MOST (La. Bar No. 36914)**
**HOPE PHELPS (La. Bar No. 37259)**
**DAVID LANSER (La. Bar No. 37764)**
201 St. Charles Ave., Ste. 114, # 101

New Orleans, LA 70170
T: (504) 509-5023
Email:williammost@gmail.com
***Counsel for Plaintiff***